1  ROBERT E. ROSENTHAL (SBN 67343)
   ANDREW B. KREEFT (SBN 126673)
2  BOHNEN, ROSENTHAL & KREEFT
   787 Munras Avenue, Suite 200
3  P.O. Box 1111
   Monterey, CA 93942-1111
4  Telephone:    (831) 649-5551
   Facsimile:    (831) 649-0272
5
   STEPHAN A. BARBER (SBN 70070)
6  DANIEL P. McKINNON (SBN 234749)
   ROPERS, MAJESKI, KOHN & BENTLEY
7  50 West San Fernando Street, Suite 1400
   San Jose, CA  95113
8  Telephone:    (408) 287-6262
   Facsimile:    (408) 918-4501
9  Email: sbarber@rmkb.com

10 Attorneys for Plaintiff
   CYNTHIA SOMMER
11

FILED

2009 SEP 24  PM 3:06

CLERK US ... T COURT
SOUTHERN DISTRICT OF CALIFORNIA

BY_____DEPUTY

12              UNITED STATES DISTRICT COURT

13              SOUTHERN DISTRICT OF CALIFORNIA

14

15 CYNTHIA SOMMER,                    CASE NO.

16              Plaintiff,            '09 CV 2093 WQH    RBB

17 v.                                 COMPLAINT FOR VIOLATION OF
                                      CONSTITUTIONAL AND CIVIL RIGHTS
18 UNITED STATES OF AMERICA, ROB      AND DAMAGES
   TERWILLIGER, RICK RENDON, MARK
19 RIDLEY, S.D. ADAMS, JOSE           [DEMAND FOR JURY TRIAL]
   CENTENO, COUNTY OF SAN DIEGO
20 MEDICAL EXAMINER'S OFFICE,
   GLENN N. WAGNER, COUNTY OF
21 SAN DIEGO DISTRICT ATTORNEY'S
   OFFICE, BONNIE DUMANIS, LAURA
22 GUNN, and DOES 1 through 100,
   inclusive,
23
                Defendant.
24

25 Plaintiff, CYNTHIA SOMMER ("Plaintiff" or "Mrs. Sommer") alleges:

26                              I.
                PARTIES, JURISDICTION, AND VENUE
27

28      1.      Mrs. Sommer was and is a citizen of the United States of America and currently

RC1/5388355.1/BL1                    -1-

COMPLAINT

1   lives in the State of Michigan.  Her husband, Todd Sommer, was a Sergeant in the United States

2   Marine Corp.  In February of 2002, he suffered a cardiac arrhythmia and died.  After a full

3   autopsy by a highly respected Naval pathologist, it was determined he died of natural causes.

4   Over the next two and a half years, Plaintiff is informed and believes that Defendants worked

5   together to fabricate false and corrupt evidence and cover up exculpatory evidence to arrest and

6   later convict Mrs. Sommer for the murder of her husband by arsenic poisoning.  In fact, it was a

7   crime that she did not commit and that Defendants knew, or had reason to know, never occurred.

8          2.      This action is brought by Mrs. Sommer for damages caused by Defendants'

9   reckless and grossly negligent conduct during their investigation of the death of Mrs. Sommer's

10  husband.  Defendants' complete disregard for the truth during their investigation resulted in an

11  innocent young woman spending almost two and a half years in jail.  Mrs. Sommer was deprived

12  of her Constitutional rights to be secure against unlawful seizure; to be secure against deprivation

13  of liberty without due process of law; and equal protection of the laws  She was also deprived of

14  the love, companionship, and respect of her children, family, and friends; deprived of her

15  reputation and privacy; deprived of past and future income; and emotional tranquility.

16         3.      The claims herein are brought against Defendant United States of America, by and

17  through the acts and omissions of the United States Department of the Navy ("Navy"); the Naval

18  Medical Center of San Diego ("Navy Med"); the United States Department of the Army

19  ("Army"); and the Armed Forces Institute of Pathology ("AFIP") (the "United States") pursuant

20  to the Federal Tort Claims Act (28 U.S.C. § 2671 et seq. and 28 U.S.C. § 1346(b)) for money

21  damages as compensation for personal and other injuries that were caused by the negligent and

22  wrongful acts and omissions of employees of the United States while acting within the scope of

23  their employment under circumstances where the United States, if a private person, would be

24  liable to Mrs. Sommer in accordance with the laws of the State of California.

25         4.      The claims herein are brought against Defendants Rob Terwilliger ("Terwilliger")

26  in his personal capacity and as an agent acting on behalf of the Navy; Rick Rendon ("Rendon"),

27  in his personal capacity and as an agent acting on behalf of the Navy; Mark Ridley ("Ridley") in

28  his personal capacity and as an agent acting on behalf of the Navy; Dr. S.D. Adams ("Adams") in

1   his personal capacity and as an agent acting on behalf of Navy Med; and Jose Centeno

2   ("Centeno") in his personal capacity and as an agent acting on behalf of AFIP (collectively

3   "Federal Defendants") for constitutional and federal statutory violations pursuant to Bivens v. Six

4   Unknown Named Agents of Fed. Bureau of Narcotics, 403 U.S. 388 (1971).

5        5.     On or about October of 2008, Plaintiff presented the United States Government

6   with an administrative claim in compliance with 28 U.S.C. § 2675, said claim being either denied

7   or left without action by the United States for a period of over six months.

8        6.     The claims herein are brought against Defendants County of San Diego Medical

9   Examiner's Office ("Examiner's Officer"); Glenn N. Wagner, D.O. ("Wagner") in his official

10   capacity and as an individual acting under the color of state law; the San Diego County District

11   Attorney's Office ("DAO"); District Attorney Bonnie Dumanis ("Dumanis") in her official

12   capacity and as an individual acting under the color of state law; Assistant District Attorney Laura

13   Gunn ("Gunn") in her official capacity and as an individual acting under the color of state law

14   (collectively "State Defendants") for violating Mrs. Sommer's clearly established rights

15   guaranteed by the Fourth, Fifth, and Fourteenth Amendments to the United States Constitution,

16   the Civil Rights Act of 1871, 42 U.S.C. Section 1983, and by the laws of the United States and of

17   the State of California.

18        7.     Defendants and each of them were the agents and/or employees of each of the

19   remaining Defendants, and in doing the things hereinafter alleged, were acting within the course

20   and scope of their authority as such agents and employees within the permission and consent of

21   their co-Defendants.

22        8.     The allegations of this complaint stated on information and belief are likely to

23   have evidentiary support after a reasonable opportunity for further investigation or discovery.

24        9.     This Court has jurisdiction over the subject matter of this Complaint pursuant to

25   42 U.S.C. Section 1983 and 28 U.S.C. Sections 1331, 1343, and 1346(b).  This Court also has

26   diversity jurisdiction pursuant to 42 U.S.C. Section 1332 because Plaintiff is a resident of

27   Michigan and the amount in controversy exceeds $75,000.

28        10.     Venue is proper in this Court pursuant to 28 U.S.C. Sections 1391 and 1402(b)

RCI/5388355.1/BL1      -3-

**COMPLAINT**

1    because a substantial amount of the conduct complained of occurred in the County of San Diego,

2    California.

## II.
## FACTS

11.    Mrs. Sommer and her husband, Sergeant Todd Sommer of the United States

Marine Corps, lived together on base at the Marine Corps Station Miramar near San Diego,

California. On or about Friday, February 8, 2002, Todd became ill after eating an egg roll from a

convenience store in a remote location of El Centro, California. He went to the infirmary on base

and was seen by military physicians. They ran a series of tests, including blood tests. The results

were all normal. The military doctors concluded that he had gastroenteritis likely caused by food

poisoning from the egg roll he had eaten. They prescribed medications. A few days later Todd

was feeling better. He returned to work on Wednesday and worked the remainder of the week.

On Saturday, February 16, 2002, Todd took his family on vacation to the Knotts Berry Farm

amusement park in Anaheim, California, where he rode roller-coasters, ate cotton candy, and

drank a few beers while enjoying time with his wife and children. They returned home on

Sunday, February 17, 2002.

12.    Todd was feeling better, but later that evening he complained that his heart was

fluttering. It was getting late and he decided to go to bed since he was going into work early the

following morning. In the early hours of February 18, 2002, Todd became restless. Mrs.

Sommer woke him up and asked him if he was feeling alright and he replied that he was fine. He

got out of bed and went toward the bathroom, when he suddenly collapsed on the floor. She

rushed to him. Todd appeared to be unconscious and she immediately dialed 911.

13.    Mrs. Sommer began administering CPR as best she could. The military police

arrived within minutes and took over CPR efforts. Shortly thereafter the ambulance arrived and

transported him to the hospital. Approximately a half-hour after arriving at the hospital, Mrs.

Sommer was informed that her husband was dead. Sgt. Todd Sommer was 23 years old.

14.    On February 19, 2002, Dr. Stephen L. Robinson, a Captain and 21 year veteran in

the United States Marine Corps and a pathologist at Navy Med, conducted the autopsy. At the

RC1/5388355.1/BL1                                    -4-

**COMPLAINT**

1 time, Dr. Robinson was the Regional Armed Forces Medical Examiner for San Diego, California.

2 His duties included investigating the cause and manner of death involving federal interests (i.e.,

3 enlisted servicemen who died). He was board certified in anatomic pathology, clinical pathology,

4 and forensic pathology, and had conducted over 500 autopsies.

5      15.   Dr. Robinson did a complete and thorough evaluation of the chest, stomach, head,

6 central nervous system, neck, cardiovascular system, coronary arteries, conduction system, aorta,

7 respiratory system, liver, biliary system, alimentary system, the tongue, esophagus, the bowel,

8 genitourinary system, the spleen, the thyroid, adrenal glands, and musculoskeletal system.

9      16.   Dr. Robinson performed a microscopic examination of the heart's left anterior

10 descending artery, the heart's interventricular septum, left ventricular anterior and posterior walls,

11 the heart's left ventricular lateral wall and right ventricle, the lungs, liver, kidneys, spleen,

12 thyroid, colon, intestines, and fourteen separate sections of the brain.

13      17.   The autopsy examination showed no evidence of injury, let alone injuries

14 associated with arsenic poisoning. Arsenic poisoning would have caused severe organ damage

15 (e.g., damage to the cells of the internal organs, such as the kidney, liver, lungs, the fibers of the

16 heart, the blood vessels, bone marrow, etc.) that would have been apparent to Dr. Robinson

17 during the autopsy. Dr. Robinson collected blood, bile, vitreous, gastric contents, and tissue

18 samples, and submitted them for toxicological analysis. The results of the toxicology test were

19 also normal. Tissue samples were collected by Dr. Robinson and preserved.

20      18.   Based on the results of the autopsy, and after consulting with the department's

21 Neuropathologist and the Department of Cardiovascular Pathology at AFIP, Dr. Robinson

22 concluded that Todd Sommer, a "23 year-old male, active duty United States Marine Corps, most

23 likely died as a result of cardiac arrhythmia" and the "manner of death, in my opinion is

24 NATURAL." [Emphasis in original.]

25      19.   The autopsy report was forwarded to San Diego County Chief Medical Examiner,

26 Dr. Brian D. Blackbourne. Dr. Blackbourne had a 35 year history as a highly respected forensic

27 pathologist. He had been the San Diego Chief Medical Examiner since 1990. After reviewing

28 the autopsy report, Dr. Blackbourne concurred with Dr. Robinson that the cause of Todd

1   Sommer's death was natural. On June 14, 2002, Dr. Blackbourne prepared a death certificate

2   identifying the manner of death as natural and the cause of death as probable cardiac arrhythmia

3   of undetermined etiology.[1]

4       20.     After her husband's death, Mrs. Sommer and her children were permitted to stay in

5   their home on base for a short period of time until other living arrangements were made. She

6   tried to escape the tragedy of being a young widowed mother by surrounding herself with friends.

7   She, at times, accepted the affection of Todd's Marine friends in an effort to replace the loss of

8   Todd's love and companionship. Her grief was inescapable, and like many others who have

9   experienced the tragic loss of a loved one, she grieved in her own personal way. She had no

10  reason to believe that how she grieved following her husband's death would later become the

11  central focus of the Defendants' investigation, and that any perceived or subjective indiscretion

12  would be used to establish the probable cause to arrest and wrongfully convict her.

13      21.     Notwithstanding the clear results of the autopsy, the Defendants refused to accept

14  those results and embarked upon an investigation intended to find criminal conduct on the part of

15  Plaintiff. Despite Drs. Robinson's and Blackbourne's conclusions, based on a thorough and

16  complete autopsy and toxicological examinations, that Todd Sommer died of natural causes,

17  Naval investigators concluded that Mrs. Sommer was not grieving in a way they believed a

18  military widow should. Naval investigators discovered that in the months following her

19  husband's death there were complaints about loud gatherings at her military home, she was

20  drinking excessively at bars, she had sexual relationships with other Marines, and had breast

21  augmentation surgery. Naval investigators felt Mrs. Sommer's behavior was insulting to all

22  Marines and called it "conduct unbecoming a widow." Defendant Terwilliger , a special agent

23  with the Naval Criminal Investigative Services ("NCIS") personally disapproved of Mrs.

24  Sommer's behavior, later referring to her as a "party girl." Their personal prejudices blinded

---

[1]   According to the Centers for Disease Control and Prevention ("CDC"), each year in the United States, approximately 4,000 children and young people die suddenly from cardiac arrhythmia. Many are affected during periods of sleep. In 1996, the Journal of the American Medical Association ("JAMA") reported that 1 in 200,000 high school athletes in the United States will die suddenly from cardiac arrhythmia, most without any prior symptoms. As awareness grows, CDC reports the incidence of deaths from sudden cardiac arrhythmia in young people between the ages of 15 and 34 has been increasing.

1    them to the fact that there was not the slightest bit of evidence to suggest that Todd Sommer's

2    death was anything but natural, and that Mrs. Sommer's behavior after his death, even if

3    inappropriate to some, did not make her a murderer.

4         22.    Despite the lack of any evidence of a crime, NCIS special agent Ridley was

5    confident that Mrs. Sommer's conduct and breast implants proved that she had murdered her

6    husband. Ridley disregarded the medical opinions of two highly respected pathologists, the other

7    medical professionals they had consulted with, and a body of medical literature in forming his

8    own unsupported "medical" opinion that "twenty-three year old young men don't just die."

9    Ridley thought the investigation just "needed additional work" and that eventually Naval

10   investigators would find something to implicate her. Later, Naval investigators became frustrated

11   because after over thirteen months of investigation, there was still no evidence to support their

12   hypothesis that Mrs. Sommer killed her husband.

13        23.    Desperate for any evidence to justify their continued investigation, Naval

14   investigators sent liver, kidney, blood, and urine samples taken by Dr. Robinson during the

15   autopsy to the Environmental Division of the Armed Forces Institute of Pathology ("AFIP

16   Environmental") for rarely performed heavy metals testing. Defendant Centeno served as the lab

17   director and oversaw all work performed at the lab. At the time, defendant Wagner served as the

18   director of AFIP and was responsible for final oversight of all work performed at the lab.

19        24.    At some point before or after AFIP Environmental took custody of the tissue

20   samples, the samples were negligently or intentionally contaminated, resulting in a false positive

21   for the presence of arsenic in some of the tissues. AFIP purportedly found extremely high levels

22   of arsenic in two of the six tissue samples they tested. The remaining four tissues contained

23   normally acceptable amounts of arsenic. The results appeared to be inaccurate because arsenic is

24   ubiquitous. If high levels of arsenic had been found in two of the tissue samples, tests should

25   have shown high levels of arsenic in the remaining four as well. Additionally, there should have

26   been arsenic in the blood and urine. Centeno believed that the two tissues that tested positive for

27   arsenic had likely been contaminated, possibly coming into contact with arsenic at Naval Med,

28   during transportation to AFIP, or while at the AFIP lab. Nevertheless, the false, corrupted, and

RC1/5388355.1/BL1                          -7-

**COMPLAINT**

1  perhaps fabricated test results were provided to the other Defendants who ultimately used them to

2  wrongfully arrest, incarcerate, and convict Mrs. Sommer.

3       25.    Plaintiff is informed and believes, and on that basis alleges that Defendants, and

4  each of them, knew or had reason to know that AFIP Environmental did not have the experience

5  to properly perform heavy metal testing on human tissue samples. Plaintiff is informed and

6  believes that this was the first time AFIP Environmental lab technicians had conducted these

7  types of tests, or tested biological tissues. As the Environmental Division of AFIP, their

8  experience was limited to testing water and soil samples, not human tissue. In general, testing

9  for arsenic in biological tissues was sent to the Forensic Division of AFIP, which had the

10  experience and qualifications to perform such tests. Plaintiff is informed and believes, and on

11  that basis alleges that Defendants purposefully directed AFIP Environmental to perform the

12  testing rather than the Forensic Division of AFIP because they knew a competent testing facility

13  would conclusively prove that Todd Sommer did not die of arsenic poisoning.

14       26.    Moreover, AFIP Environmental had just purchased a new Inductively Coupled

15  Plasma Mass Spectrometer ("ICPMS"). AFIP Environmental arranged with NCIS to have Todd's

16  tissue samples sent to them so they could test their new machine for the first time on biological

17  tissues. Therefore, the AFIP Environmental lab technicians were not only performing tests they

18  had never done before and were unqualified to do, but were performing a "test run" on a machine

19  they were unfamiliar with and had never used to conduct heavy metals testing on human tissue.

20  Additionally, AFIP Environmental did not have a Standard Operating Procedure in place to

21  assure that proper methods and safeguards were being utilized to assure the integrity of the test

22  results, or the chain of custody.

23       27.    The Defendants, and each of them, knew or had reason to know that the results of

24  the testing conducted by AFIP Environmental were corrupt, false, implausible, and completely

25  lacking in credibility. There were over sixteen breaks in the chain of custody after AFIP

26  Environmental received the tissue samples. The tissue samples went weeks without being

27  accounted for between testing, and some portions of the samples disappeared altogether, never to

28  be accounted for. Tissues that are not properly maintained are susceptible to contamination,

1   including bacteria and other sources that produce false positives for arsenic.  The tests conducted

2   by AFIP Environmental showed unprecedented levels of arsenic in Todd Sommer's liver and

3   kidney.  The results were so unusually high that such findings had never been seen in the history

4   of reported arsenic testing and exceeded any previously reported contamination levels by

5   approximately twelve-hundred fifty percent (1,250%).  It was scientifically impossible to have

6   such high levels of arsenic in only two of the tissue samples while the remaining four tissue

7   samples showed normal levels.  If the test results were accurate, lethal amounts of arsenic would

8   have been found in all six tissue samples.  Additionally, high levels of arsenic would have been

9   found in Todd Sommer's blood and urine.  The results of the blood and urine tests by AFIP

10  Environmental were normal.  Moreover, the test results from AFIP Environmental showed

11  ninety-eight percent (98%) of the arsenic purportedly found in the two tissue samples had been

12  metabolized to dimethylate ("DMA").  When a person is poisoned with arsenic, the arsenic is

13  metabolized by the body into nine different species.  The average amount of DMA typically

14  present is four percent (4%).  Never in the history of arsenic testing had there been a finding that

15  virtually all the arsenic found in tissue samples had metabolized into DMA.  This was simply

16  impossible and clearly showed AFIP's test results were inaccurate.

17       28.     Further, AFIP Environmental's findings of arsenic were incongruous with Todd's

18  activities prior to his death.  Even at his worst, Todd did not exhibit symptoms consistent with

19  arsenic poisoning.  He was seen by military physicians who did not see anything that would

20  suggest arsenic poisoning.  Rather, he exhibited mild to moderate symptoms associated with food

21  poisoning.  With the help of the prescribed medications he was back to work in a few days.  He

22  continued to feel better and the night before he died he was on a roller coaster with his family at

23  an amusement park.  Similarly, AFIP's test results were contradicted by the autopsy results found

24  by Dr. Robinson and confirmed by Dr. Blackbourne.  The autopsy results showed no indication of

25  physical damage to Todd Sommer's body, and specifically no damage to the internal organs or

26  blood vessels.  Arsenic poisoning would have been apparent to Dr. Robinson, a skilled and

27  / / /

28  / / /

RCI/5388355.1/BL1                                -9-

**COMPLAINT**

1   experienced pathologist. After a thorough investigation, there was no evidence of arsenic

2   poisoning and Drs. Robinson and Blackbourne concluded that Todd Sommer died of natural

3   causes.

4         29.    During their investigation prior to Mrs. Sommer's arrest, Defendants consulted

5   with several qualified independent forensic toxicologists. All of these experts refused to concur

6   in the results of the testing performed by AFIP due to the fact that the results were demonstrably

7   false. Plaintiff is informed and believes, and on that basis alleges that Defendants ignored all of

8   these experts' honest and justified conclusions because Defendants were desperate to charge

9   Plaintiff with a crime they knew never occurred.

10         30.    In the summer of 2003, Defendants contacted Alphonse Poklis, a highly respected

11   forensic pathologist and the leading expert in arsenic poisoning at Virginia Commonwealth

12   University. Defendants provided Dr. Poklis with Todd Sommer's medical records and AFIP's

13   test results. Dr. Poklis told Defendants that there was no evidence that Todd Sommer died of

14   arsenic poisoning and that the AFIP test results were false. Even Defendant Centeno, the AFIP

15   chemist who oversaw the testing, questioned the validity of the test results and at one point told

16   the Defendants that the tissues appeared to be contaminated.

17         31.    Prior to Mrs. Sommer's arrest, Defendants, and each of them, knew or had reason

18   to know that Todd Sommer was not poisoned by arsenic or murdered, and that the test results

19   from AFIP were caused by sample contamination because they were completely at odds with the

20   autopsy findings, contradictory to test results and all published scientific literature regarding

21   arsenic poisoning, and contradictory to the opinions of several qualified and highly respected

22   independent forensic toxicologists. Thus, the AFIP test results completely lacked any objective

23   credibility with respect to the cause of Todd Sommer's death.

24         32.    Dumanis and Gunn knew or should have known during the investigation that

25   preceded Mrs. Sommer's arrest that there was no evidence on which to arrest, charge, and convict

26   Mrs. Sommer for the death of her husband. They knew or should have known that the AFIP test

27   results were false and that there was no evidence to support their theory that Mrs. Sommer

28   poisoned her husband with arsenic.

| RCI/5388355.1/BL1 | -10- | |
|---|---|---|

33.    Plaintiff is informed and believes, and on that basis alleges that Defendants, and each of them, were consumed with finding any "evidence," irrespective of its credibility, to establish probable cause to arrest and convict Mrs. Sommer because of their own personal ambitions and biases. Naval investigators had spent years investigating Mrs. Sommer and needed to justify their investigation for the sake of their careers by using any evidence they could to inculpate Mrs. Sommer. Similarly, Dumanis and Gunn had political ambitions and believed that a high-profile arrest and conviction would serve their personal goals and make them and the DAO famous. Plaintiff is informed and believes, and on that basis alleges that Dumanis and Gunn colluded with Naval investigators to fabricate a motive for Mrs. Sommer to kill her husband, a man who was not only the primary financial support for the family but, by all accounts, was a good, caring husband and father to her four young children.

34.    Naval investigators told Dumanis and Gunn about Mrs. Sommer's "promiscuity" and breast implants in the months following her husband's death. Dumanis and Gunn knew or should have known this information was irrelevant and could not refute Drs. Robinson's and Blackbourne's findings, and other supporting evidence, that Todd Sommer died of natural causes. Plaintiff is informed and believes, and on that basis alleges that Dumanis, Gunn and Naval investigators sought to change Todd Sommer's death certificate to list his cause of death as homicide by arsenic so that they could make their pieces fit.

35.    Coincidently, Defendant Wagner had recently left AFIP to become the San Diego County Chief Medical Examiner in 2003. Defendant Adams had recently replaced Dr. Robinson as the Regional Armed Forces Medical Examiner for San Diego, California, at Navy Med. With Drs. Robinson and Blackbourne out the way, Dumanis, Gunn, and Naval investigators convinced Wagner to adopt the corrupt, false, and possibly fabricated AFIP test results, and to change Todd Sommer's death certificate to identify his cause of death as homicide by arsenic without objective cause or support.

36.    Wagner and Adams knew or should have known that the AFIP test results were corrupt, false, and possibly fabricated, but failed to conduct an independent evaluation of the AFIP test results. In February of 2005, over nine months before Mrs. Sommer's arrest, Wagner

RCI/5388355.1/BL1                          -11-
**COMPLAINT**

1  sent an email to Centeno, now the director of AFIP, asking why the tests were so "unusual" with

2  respect to only two tissues testing positive for arsenic while the blood, urine, and other four tissue

3  samples were normal.  Centeno replied that he, too, was "surprised by the high arsenic levels" and

4  "thought that the tissue samples were contaminated during collection."  He went on to admit:  "I

5  don't have a good interpretation of these results."

6        37.    Despite the concern expressed by the independent toxicologists and his own

7  doubts about the validity of the results, defendant Centeno, the AFIP chemist who oversaw the

8  testing, agreed to approve and adopt the results and to opine, without proper basis, that Todd

9  Sommer had died from massive arsenic poisoning.

10        38.    Plaintiff is informed and believes that Defendants, including Wagner and Adams,

11  knew there were additional tissue samples from Todd Sommer collected and preserved by Dr.

12  Robinson in the custody of Navy Med.  Defendants failed to seek testing of these preserved

13  tissues to confirm, or refute, AFIP's questioned and unprecedented test results.

14        39.    Plaintiff is informed and believes that Wagner had his own motive for covering up

15  AFIP's fabricated test results.  At the time the tests were conducted, he was the director of AFIP

16  and had final oversight of all testing that was performed there.  He knew that if he discredited

17  AFIP's test results it would be a public embarrassment not only for himself, but also for AFIP.

18  Wagner was also motivated by his own personal prejudices and bias against Mrs. Sommer,

19  because according to Wagner "tattoos and implants" are an "image obsession [that] seems to set

20  the stage for behaviors" that lead to death.  Instead of doing what was right by exposing the truth,

21  Wagner chose to work together with the other Defendants to cover up the corrupt, false, and

22  possibly fabricated test results, protecting his professional image and AFIP's credentials.  Wagner

23  changed Todd Sommer's death certificate from stating Todd Sommer died of natural causes to

24  listing his cause of death as homicide by arsenic, for his own personal and professional gains,

25  even though he, as well as the other Defendants, knew or should have known this was false.

26  These conflicts of interest, personal motivations and conspiratorial acts among and between the

27  Defendants were instrumental in violating Plaintiff's civil rights.

28        40.    Defendants knew they needed more than unreliable test results, breast implants,

and a false death certificate to arrest and convict Mrs. Sommer for the death of her husband. Even if they could successfully convince a court that the false and possibly fabricated AFIP test results established that Todd Sommer died of arsenic poisoning, they had no evidence that Mrs. Sommer poisoned him. Although Defendants made every effort to connect Mrs. Sommer with arsenic, they could not overcome the fact that she never possessed arsenic, had never purchased arsenic, had never researched arsenic on the Internet or elsewhere, never spoke to anyone about arsenic, or never expressed anything but love and happiness for her husband and their marriage.

41. Without credible evidence to support their theory that Todd was poisoned by Plaintiff with arsenic, Defendants focused on the standard two hundred fifty thousand dollar ($250,000) Service Members Group Life Insurance ("SGLI") policy as a motive for murder. The truth, however, is that Mrs. Sommer did not even acquire the policy proceeds herself. Despite the uncertain future of being a young widow raising four children, the loss of valuable housing that had been provided by the military, and the loss of Todd's monthly income and other benefits, Mrs. Sommer placed over half of the policy benefits into an irrevocable trust for their four children. She used most of the remainder to pay loans and other substantial consumer debt the family had jointly incurred during their marriage while living off of a military salary. In order to make ends meet, Mrs. Sommer returned to working at a local Subway sandwich shop soon after her husband's death, supporting herself and her four children on minimum wage and the little bit of money she had reserved from the benefits of Todd's SGLI policy. Nevertheless, Defendants ignored the fact that these were hardly the actions of a woman who supposedly murdered her husband for financial gain. Defendants, and each of them, continued to seek out only potentially inculpatory evidence, while literally burying and/or disregarding any exculpatory evidence.

42. Defendants and each of them knew that buried in a box in a closet at the Balboa Naval Hospital were additional tissue samples that would have further invalidated the AFIP test results. They knew or should have known that the AFIP test results were corrupt, false, and possibly fabricated. They also knew or should have known that testing the remaining preserved tissues would have exonerated Mrs. Sommer because it would have further proven that Todd Sommer was not murdered, but died of natural causes. Defendants chose not to send the

1    preserved tissue samples out for testing.  Rather, they sealed them back up in the box and left

2    them buried in a closet until Mrs. Sommer had been arrested, convicted, and spent almost two and

3    half years in jail for a murder that never happened.

4         43.    The Defendants' actions went beyond poor judgment or even indifference.

5    Federal and state officers wielded their positions of power and public trust to knowingly deprive a

6    young woman of her Constitutional rights to liberty, due process, and freedom from unlawful

7    arrest and seizure.

8         44.    On or about November 29, 2005, Naval investigators interviewed Mrs. Sommer.

9    She had moved her family to Florida to be close to Todd's parents.  They had a good relationship

10   and having just lost their son, it was good for Todd's parents to be close to their grandchildren.

11   Mrs. Sommer was still working hard to support her family making a moderate income working

12   for a telemarketing company.  Naval investigators contacted her at her work and told her they

13   needed to meet with her because they had new information about Todd's death.  She met them at

14   the Sheriff's Office and they asked if they could interview her and tape record it.  She agreed to

15   the tape recorded interview.

16        45.    According to Naval investigators, there was either a malfunction of the tape

17   recorder or one of them forgot to press the "Record" button when the interview started.  Out of all

18   the interviews they had successfully recorded, Naval investigators intentionally or negligently

19   failed to record the interview of Mrs. Sommer, their prime murder suspect.  Afterwards, Naval

20   investigators discussed what they "recalled" were the questions that were asked and "recalled"

21   Mrs. Sommer's responses, and put this information down in a report in lieu of the actual

22   recording of the interview.

23        46.    Plaintiff is informed and believes and on that basis alleges that this "phantom

24   interview" played a key role in Defendants' investigation leading up to Mrs. Sommer's arrest.

25   Defendants used it to establish probable cause to arrest Mrs. Sommer, even though it was based

26   entirely on the subjective recollections of Naval investigators.

27        47.    The following day, on November 30, 2005, Mrs. Sommer was arrested and

28   charged with murdering her husband by arsenic poisoning.  She was held throughout trial without

RCI/5388355.1/BL1                          -14-

**COMPLAINT**

1    bail. Mrs. Sommer was locked up in a jail that houses 750 other inmates. Contact with its

2    prisoners is prohibited, and any visits are conducted through heavy Plexiglas using a telephone.

3    Visits are limited to 30 minutes without exception. Mrs. Sommer's daughter, who was the oldest

4    of her four young children, visited her only twice. It was too traumatic for the younger children

5    to visit. Mrs. Sommer was demoralized by the loss of any meaningful contact with her children,

6    her loss of liberty, and her loss of privacy.

7           48.    Mrs. Sommer shared a small cell with two other inmates. She was the property of

8    the State and her days were strictly regimented. Defendants succeeded in making sure she was

9    punished for grieving "inappropriately" after Todd's death and she would no longer trouble

10   society or the delicate sensibilities of the Marine Corps.

11          49.    Months passed by while her criminal trial was underway. Her case was

12   sensational and therefore newsworthy. The local, national, and international news media could

13   not get enough of Defendants' fabricated story: a young wife with four children killing her

14   Marine husband with arsenic to get his $250,000 life insurance policy so she could spend it on

15   breast implants, sex, and wild parties! Plaintiff is informed and believes Defendants welcomed

16   the media attention, and maliciously disclosed personal and private information about Mrs.

17   Sommer further sensationalizing the case. Defendants used their pulpit to falsely brand Plaintiff

18   throughout the country as "Mrs. Sommer the tramp who poisoned and killed a father and

19   Marine", causing her to lose legal custody of her children.

20          50.    Months turned into years, with no perceivable end to the nightmare the Defendants

21   had orchestrated. Mrs. Sommer remained optimistic that the trial would expose the lies and

22   deceit upon which her arrest was based. The Defendants, however, were unstoppable. The jurors

23   trusted the federal and state governmental agents, believing they would not attempt to mislead

24   them with corrupt, false, and fabricated test results. Having duped the jury into believing that

25   Todd Sommer died of massive amounts of arsenic poisoning, Defendants exposed illicit details

26   about Mrs. Sommer's lifestyle that they knew were unrelated to the cause of Todd Sommer's

27   death, but that would wrongfully persuade the jury to render a guilty verdict based on character

28   assassination. It worked. Mrs. Sommer's "promiscuity" and breast implants, coupled with the

RCI/5388355.1/BL1                           -15-

**COMPLAINT**

fabricated test results, proved sufficient justification for the jury to convict her of murder. On January 30, 2007, Mrs. Sommer was wrongly convicted of murdering her husband by arsenic poisoning.

51.   Mrs. Sommer was shocked. It was unconscionable and incomprehensible that a group of governmental agents, who are given great power by the federal and state government to protect the public, would sacrifice Mrs. Sommer's freedom for their own personal and professional ambitions. On the verge of despair, Mrs. Sommer returned to the small cell that she shared with two other inmates while Defendants celebrated their fait accompli.

52.   Following the jury's verdict, Mrs. Sommer's family hired a new attorney, Allen Bloom, who worked diligently to reverse the conviction and filed a motion for a new trial with several discovery motions in the spring and summer of 2007. On November 30, 2007, the court granted a new trial.

53.   After a new trial was granted, Mrs. Sommer's attorney sought information about the approximately thirty tissue samples which had been originally listed in the autopsy report. Defendant Gunn informed Mr. Bloom that the tissues no longer existed. Upon making a second inquiry on Gunn regarding these samples, Mr. Bloom was informed a second time they were no longer in existence. A formal written discovery request for information about these tissue samples resulted in Gunn and/or her investigators visiting the Navy Med autopsy site and retrieving the "non-existent" tissue samples they had left buried in the closet of the Balboa Naval Hospital.

54.   Rather than contradict their prior representations of the tissues non-existence by disclosing their existence to Mrs. Sommer's attorney, on March 20, 2008, Defendants, without notifying Mrs. Sommer or her attorney, sent the tissue samples to be tested at a highly respected private testing facility in Canada. The results were staggering. None of the tissue samples showed the presence of any arsenic whatsoever. This conclusive evidence proved that Todd Sommer had not been poisoned at all, and that Mrs. Sommer had been convicted of a crime that had never occurred. Defendants Gunn and Dumanis' attempts to hide and not disclose this exculpatory evidence were now exposed. Dumanis and Gunn had no choice but to acknowledge

RC1/5388355.1/BL1                                          -16-

**COMPLAINT**

1  Mrs. Sommer was innocent and dismiss all charges.  After dismissing the charges, Defendant

2  Dumanis sought to convince the public that she and Gunn had "made the right choices for the

3  right reasons at every step in the process," claiming that "while Sommer came close to spending

4  the rest of her life in prison, the system eventually worked."

5       55.    Ultimately, after the samples had been tested, Mrs. Sommer's attorney, discovered

6  that a memorandum had been placed on the box containing the tissue samples located at Balboa

7  Naval Hospital.  On August 31, 2007, three months prior to the new trial being granted, Adams

8  had prepared a "Special Attention" memorandum to "All whom it may concern" and attached it to

9  the box containing the tissue samples.  The subject line read in bold capital letters:

10  **"RETENTION OF AUTOPSY MATERIALS IN THE CASE OF SERGEANT TODD**

11  **SOMMER, USMC, A02-13."**  In the memorandum, Adams acknowledged both his and the

12  District Attorney's prior knowledge of the tissues' importance and their obvious relevance to

13  Plaintiff's pending criminal case.  Notwithstanding this acknowledgement, neither Adams,

14  Dumanis, nor Gunn disclosed the tissues existence to anyone on behalf of Plaintiff.  In fact,

15  Defendants knew of these samples at all times, knew they were untested, and knew their testing

16  would resolve the conflicting test results from the AFIP tested samples.  Adams, Dumanis, and

17  Gunn chose to box and store these samples, disregarding their potential for proving Plaintiff's

18  innocence.  All the while Plaintiff remained convicted, imprisoned and seeking a new trial, said

19  motion opposed by Defendants.

20       56.    On April 17, 2008, almost two and one half years after she had been incarcerated,

21  Mrs. Sommer, a young widow and mother of four, was released from custody owning nothing

22  more than the clothes on her back.  By the time she finally regained her freedom, she had lost

23  everything.  Custody of her children was no longer hers.  She had spent over $500,000 in criminal

24  defense costs, first depleting the little money she had of her own, then by borrowing from the few

25  family and friends who steadfastly believed she would be proven innocent and were willing to

26  support her.  She lost the love, companionship, and support of other friends and family who were,

27  and still are, unable to grasp or believe the horror of Defendants' actions.  She will be forever

28  ostracized in this country as a murderer, with many people always mistakenly believing that she

1   is a father and husband killer who got away with it.  She was not only deprived of her ability to

2   earn a living while incarcerated, but because she will always be stigmatized in her local

3   community and in the country as a whole, her ability to earn a living in the future has been

4   severely damaged.  Her private life and personal grief has been invaded, with every sordid detail,

5   whether true or not, permanently exposed on the Internet, television, and in print publications for

6   viewing by future employers, friends, and even her own children.

7          57.    Defendants permanently stained Mrs. Sommer's reputation with their lies and

8   reckless disregard for her Constitutional rights.  She continues to suffer emotionally and

9   financially as a direct and proximate result of Defendants' investigation, fabrication of evidence,

10  and wrongful arrest, which all preceded the subsequent prosecution and wrongful conviction for a

11  crime that Defendants always knew, or should have known, never occurred.  Despite conclusive

12  proof that she did not murder her husband, she will forever suffer the accusations, insults, and

13  aspersions memorialized on the Internet and in printed publications by people who refuse to

14  believe that she is the innocent victim of Defendants' personal prejudices, bias, incompetence,

15  shameless ambition, and greed.  She will undoubtedly have to explain these accounts to her

16  children when they grow up and inevitably are confronted with stories about her on the internet,

17  or elsewhere.

18         58.    Even in the face of conclusive evidence that Mrs. Sommer is innocent, Defendants

19  continue to conceal their lies, incompetence, and violation of Constitutional rights, causing Mrs.

20  Sommer further pain and suffering.  Although Dumanis and Gunn dismissed the charges against

21  her, conceding that Todd had not died of arsenic poisoning, they refused to dismiss the charges

22  with prejudice, preserving their desperate and reckless hope to again charge her with murder.

23  Incredibly, their investigation of Mrs. Sommer continued after April 17, 2008, without any

24  evidence of homicide.  They are incredulous in their actions, claiming that despite an innocent

25  woman being arrested, charged, and convicted of a crime the Defendants knew never occurred,

26  they followed their ethical duty in the handling of this case.  In point of fact, however, the justice

27  system failed to protect an innocent person against the greed and ambition of government agents

28  who used their positions of power and trust under color of law to deprive Mrs. Sommer of her

RCI/5388355.1/BL1                                    -18-

**COMPLAINT**

1  Constitutional rights.  Were it not for Mrs. Sommer, her family and her attorney's resolute

2  proclamation and pursuit of her innocence and unwillingness to give up hope that the truth would

3  ultimately prevail, the boxed tissue samples in the Navy Med might still be there, and Defendant

4  might still be imprisoned.  While justice ultimately prevailed, it was in spite of Defendants'

5  actions and a failed system, and it was at the cost of the deprivation of Constitutional rights of an

6  innocent person.

7       59.  There was never any competent evidence that Todd Sommer died of arsenic

8  poisoning.  The AFIP test results were clearly false, fabricated, and corrupt.  Moreover, there was

9  never any evidence that Mrs. Sommer poisoned her husband.  She had never possessed arsenic,

10  purchased arsenic, researched arsenic, expressed any interest in arsenic, spoke to anyone about

11  arsenic, or otherwise did anything that could conceivably link her to arsenic, let alone using

12  arsenic to poison the man that, by all accounts, she loved and shared a good relationship with.

13       60.  Defendants' willful and malicious conduct continues to cause Mrs. Sommer pain

14  and suffering.  Even though the AFIP test results have been proven to be corrupt, false and

15  possibly fabricated, and there being no evidence of any homicide or arsenic poising, Defendants

16  have denied Plaintiff's demand to change Todd Sommer's death certificate from erroneously

17  identifying his cause of death as homicide by arsenic poisoning back to the only manner of death

18  supported by the evidence, specifically, that Todd died of natural causes as a result of probable

19  cardiac arrhythmia of undetermined etiology.  Defendants' intransigence and arrogance continues

20  to harm Mrs. Sommer by further perpetuating a false image of her in society as a father and

21  husband killer who got away with murder.  To this day, Plaintiff is the target of vitriolic emails

22  due only to the actions and motivations of Defendants.

23       61.  The Defendants, and each of them, knew or had reason to know that Mrs. Sommer

24  would be deprived of her Constitutional rights, specifically her rights arising from the Fourth,

25  Fifth and Fourteenth Amendments, if they utilized inculpatory evidence that was corrupt, false,

26  and fabricated to arrest and convict Mrs. Sommer for the death of her husband.  Throughout their

27  investigation into the cause of Todd Sommer's death, Defendants, and each of them, acted

28  recklessly and with gross negligence by disregarding exculpatory evidence and seeking only

RCI/5388355.1/BL1           -19-

**COMPLAINT**

potentially inculpatory evidence.  The Defendants, and each of them, colluded during their investigation to use evidence they knew or should have known was false to establish probable cause to effectuate the arrest, and subsequent incarceration, of Mrs. Sommer for the death of her husband.

### III.
### COUNT ONE
### 42 U.S.C. § 1983—VIOLATION OF CIVIL RIGHTS
### (AGAINST STATE DEFENDANTS ONLY)

62.    Plaintiff repeats and repleads each and every allegation contained in paragraphs 1 through 61, and by this reference incorporates the same herein as though fully set forth.

63.    The State Defendants, acting under color of state law, violated Mrs. Sommer's clearly established rights guaranteed by the Fourth, Fifth, and Fourteenth Amendments to the United States Constitution, the Civil Rights Act of 1871, and the laws of the State of California, by the acts alleged above.

64.    Throughout their investigation, the State Defendants and each of them knew or had reason to know that the results of the testing conducted by AFIP Environmental were corrupt, false, fabricated, and completely lacking in credibility.  Nevertheless, the State Defendants colluded during their investigation to use evidence they knew or should have known was corrupt, false, and fabricated to establish probable cause to effectuate the arrest, incarceration, and subsequent conviction of Mrs. Sommer for the death of her husband.

65.    The State Defendants knew or should have known that the deliberate fabrication of false evidence and suppression of exculpatory evidence would result in the wrongful arrest, incarceration, and subsequent conviction of Mrs. Sommer.  These acts violated Mrs. Sommer's clearly established rights under Constitutional and federal statutory law.

66.    Although the State Defendants, and each of them, knew that Plaintiff would be deprived of the equal protection of the laws by the intentional or negligent fabrication of evidence and suppression of exculpatory evidence, and had the power to prevent or aid Plaintiff from being wrongfully arrested and later convicted of crime she did not commit, neglected or refused to come forward with the truth, and expose the Federal Defendant's conspiracy to deprive Plaintiff of the equal protection of the laws.

67.     The actions described above were taken by the State Defendants with malice and with the intent to vex, annoy, and harass Plaintiff, to inflict severe emotional distress and physical harm, and were designed and calculated to deprive Mrs. Sommer of her Constitutional rights to be secure against unlawful seizure, the taking of liberty without due process of law, and equal protection of the laws, as well as her rights under federal statutes, including 42 U.S.C. §§ 1985 and 1986.

68.     Defendants DAO and Examiner's Office had a policy and custom of using, authorizing, ratifying, and/or covering up the use of corrupt, false, and fabricated evidence during their investigations.

69.     As a direct and proximate result of the acts of the State Defendants, Mrs. Sommer sustained injuries and damages arising from the deprivation of her civil rights, including violation of her clearly established rights under the Fourth, Fifth, and Fourteenth Amendments to the United States Constitution, loss of her physical liberty without due process and equal protection of the laws.  This misconduct on the part of the State Defendants has caused Plaintiff pain and suffering; severe emotional distress as a result of being deprived of the love, companionship, and respect of her children, family, and friends; economic damages including loss of income and paying for criminal defense costs; and humiliation, embarrassment, and injury to her reputation.

### IV.
### COUNT TWO
### VIOLATION OF CONSTITUTIONAL RIGHTS AND FEDERAL STATUTES
### (42 U.S.C. §§ 1985 AND 1986)
### (AGAINST FEDERAL DEFENDANTS ONLY)

70.     Plaintiff repeats and repleads each and every allegation contained in paragraphs 1 through 69, and by this reference incorporates the same herein as though fully set forth.

71.     The Federal Defendants, acting under color of law, violated Mrs. Sommer's clearly established rights guaranteed by the Fourth, Fifth, and Fourteenth Amendments to the United States Constitution and federal statutes, including 42 U.S.C. §§ 1985 and 1986.

72.     Throughout their investigation, the Federal Defendants and each of them knew or had reason to know that the results of the testing conducted by AFIP Environmental were corrupt, false, fabricated, and completely lacking in credibility.  Nevertheless, the Federal Defendants

1    colluded during their investigation to use evidence they knew or should have known was corrupt,

2    false, and fabricated to establish probable cause to effectuate the arrest, incarceration, and

3    subsequent conviction of Mrs. Sommer for the death of her husband.

4       73.     Although the Federal Defendants, and each of them, knew that Plaintiff would be

5    deprived of the equal protection of the laws by the intentional or negligent fabrication of evidence

6    and suppression of exculpatory evidence, and had the power to prevent or aid Plaintiff from being

7    wrongfully arrested and later convicted of crime she did not commit, neglected or refused to

8    come forward with the truth, and expose the Federal Defendant's conspiracy to deprive Plaintiff

9    of the equal protection of the laws.

10      74.     The Federal Defendants knew or should have known that the deliberate or grossly

11    negligent fabrication of false evidence and suppression of exculpatory evidence would result in

12    the wrongful arrest, incarceration, and subsequent conviction of Mrs. Sommer. These acts

13    violated Mrs. Sommer's clearly established rights under the Fourth, Fifth, and Fourteenth

14    Amendments to be secure against unlawful seizure, the taking of liberty without due process of

15    law, and equal protection of the laws, as well as her rights under federal statutes, including 42

16    U.S.C. §§ 1985 and 1986.

17      75.     As a direct and proximate result of the acts of the Federal Defendants, Mrs.

18    Sommer sustained injuries and damages arising from the deprivation of her civil rights, including

19    violation of her clearly established rights under the Fourth, Fifth, and Fourteenth Amendments to

20    the United States Constitution, loss of her physical liberty without due process and equal

21    protection of the laws. This misconduct on the part of Defendants has caused Plaintiff pain and

22    suffering; severe emotional distress as a result of being deprived of the love, companionship, and

23    respect of her children, family, and friends; economic damages including loss of income and

24    paying for criminal defense costs; and humiliation, embarrassment, and injury to her reputation.

25      76.     The actions described above were taken by the Federal Defendants with malice

26    and with the intent to vex, annoy, and harass Plaintiff, to inflict severe emotional distress and

27    physical harm, and justify an award of punitive damages.

28    ///

RCI/5388355.1/BL1            -22-

**COMPLAINT**

## V.
## COUNT THREE
## FEDERAL TORTS CLAIMS ACT
## (AGAINST UNITED STATES ONLY)

77.     Plaintiff repeats and repleads each and every allegation contained in paragraphs 1 through 76, and by this reference incorporates the same herein as though fully set forth.

78.     As more fully set forth above, this claim is brought by Mrs. Sommer against the United States for the wrongful acts and omissions of federal agents and employees while acting within their scope of employment during their investigation into the cause of Todd Sommer's death.

79.     Throughout their investigation, the agents and employees of the United States, and each of them, knew or had reason to know that the results of the testing conducted by AFIP were corrupt, false, fabricated, and completely lacking in any credibility.  Nevertheless, the agents and employees of the United States  negligently or intentionally used  fabricated or contaminated evidence they knew or should have known was corrupt, false, and completely lacking in credibility to establish probable cause to effectuate the arrest and subsequent conviction of Mrs. Sommer for the death of her husband.

80.     The negligent and wrongful actions described above deprived Mrs. Sommer of her Constitutional rights to be secure against unlawful seizure, the taking of liberty without due process of law, and equal protection of the laws.

81.     The aforementioned conduct constitutes fraud, negligence, false imprisonment, assault, battery, defamation, intentional and negligent infliction of emotional distress, and invasion of privacy.

82.     As a direct and proximate result of United States' outrageous conduct, Mrs. Sommer was deprived of the love, companionship, and respect of her children, friends, and family, her reputation, past and future income, paying for criminal defense costs, and has suffered severe emotional distress.

/ / /

/ / /

# VI.
## COUNT FOUR
## PERMANENT INJUNCTION
## (AGAINST ALL DEFENDANTS)

83.     Plaintiff repeats and repleads each and every allegation contained in paragraphs 1 through 82, and by this reference incorporates the same herein as though fully set forth.

84.     Defendants' wrongful conduct as alleged above, unless and until enjoined and restrained by order of this Court, will cause great and irreparable injury to Plaintiff and all similarly situated individuals.

85.     Plaintiff and all similarly situated individuals have no adequate remedy at law for their injuries. The Defendants are unrestrained in their ability to waste hard-earned taxpayer money, and can escape liability by using the great governmental power and resources entrusted to them by the people. If left unfettered, Defendants, and each of them, can systematically and continuously violate the Constitutional rights of individuals, including Plaintiff.

86.     There are no countervailing benefits to violating the Constitutional rights of individuals, and as long as Defendants are allowed to continue to investigate, incarcerate, and wrongfully convict innocent persons for their own personal greed and selfish ambitions, the public, including Plaintiff, will continue to be irreparably harmed.

87.     Therefore, the Court should order the dismissal of the criminal case against Plaintiff "with prejudice," and order Defendants to cease further investigation against Plaintiff to prevent continued violation of her rights.

88.     The Court should also order the correction of Todd Sommer's death certificate to reflect the evidence demonstrating that the cause of death was natural.

89.     Further, the Court should order the DAO, Examiner's Office, and the United States (by and through its agents and employees of the Army and Navy) to require their agents and employees to undergo additional mandatory training and testing to ensure their agents and employees understand and comply with their legal duties with respect to the proper handling and use of evidence during criminal investigations.

/ / /

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff respectfully prays for judgment against Defendants as follows:

1.     For an award of compensatory damages from Defendants, jointly and severally, in an amount not less than $20,000,000.00;

2.     For an award of punitive damages against the individual Defendants sued in their personal capacity, for all actions including those outside the scope of the employment.

3.     For an award of attorney's fees and cost of suit;

4.     For an order directing Defendants to dismiss the criminal case against Plaintiff with prejudice;

5.     For an order directing Defendants to correct Todd Sommer's death certificate to reflect the cause of death as natural;

6.     For an order directing the DAO, Examiner's Office, and the United States (by and through its agents and employees of the Army and Navy) to require their agents and employees to undergo additional mandatory training and testing to ensure their agents and employees understand and comply with their legal duties with respect to the proper handling and use of evidence during criminal investigations; and

7.     For such other and further relief as the court may deem just and proper.

Dated:  September 24, 2009

BOHNEN, ROSENTHAL & KREEFT

By: _____
ROBERT E. ROSENTHAL

Dated:  September 24, 2009

ROPERS, MAJESKI, KOHN & BENTLEY

By: _____
STEPHAN A. BARBER

/ / /

/ / /

/ / /

/ / /

## JURY DEMAND

Plaintiff Cynthia Sommer hereby demands a trial by jury.

_____
ROBERT E. ROSENTHAL

_____
STEPHAN A. BARBER

JS 44 (Rev. 12/07) **CIVIL COVER SHEET**

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. (SEE INSTRUCTIONS ON THE REVERSE OF THE FORM.)

**I. (a) PLAINTIFFS**
CYNTHIA SOMMER

**DEFENDANTS**
UNITED STATES OF AMERICA, ROB TERWILLIGER, RICK RENDON, MARK RIDLEY, S.D. ADAMS, JOSE CENTENO, COUNTY OF SAN DIEGO MEDICAL EXAMINER'S OFFICE, GLENN N. WAGNER, COUNTY OF SAN DIEGO DISTRICT ATTORNEY'S OFFICE, BONNIE DUMANIS, LAURA GUNN, and DOES 1 through 100, inclusive,

**(b)** County of Residence of First Listed Plaintiff _____
(EXCEPT IN U.S. PLAINTIFF CASES)

County of Residence of First Listed Defendant _____
(IN U.S. PLAINTIFF CASES ONLY)
NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE LAND INVOLVED.

**(c)** Attorney's (Firm Name, Address, and Telephone Number)
ROBERT E. ROSENTHAL (SBN 67343)
ANDREW B. KREEFT (SBN 126673)
BOHNEN, ROSENTHAL & KREEFT
787 Munras Avenue, Suite 200
P. O. Box 1111
Monterey, CA 93942-1111
Telephone: (831) 649-5551
Facsimile: (831) 649-0272

STEPHAN A. BARBER (SBN 70070)
DANIEL P. McKINNON (SBN 234749)
ROPERS, MAJESKI, KOHN & BENTLEY
50 West San Fernando Street, Suite 1400
San Jose, CA 95113
Telephone: (408) 287-6262
Facsimile: (408) 918-4501

Attorneys (If Known)

'09 CV 2093 WQH    RBB

**II. BASIS OF JURISDICTION** (Place an "X" in One Box Only)

| | |
|---|---|
| ☐ 1 U.S. Government Plaintiff | ☐ 3 Federal Question (U.S. Government Not a Party) |
| ☒ 2 U.S. Government Defendant | ☐ 4 Diversity (Indicate Citizenship of Parties in Item III) |

**III. CITIZENSHIP OF PRINCIPAL PARTIES** (Place an "X" in One Box for Plaintiff and One Box for Defendant)
(For Diversity Cases Only)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

**IV. NATURE OF SUIT** (Place an "X" in One Box Only)

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ☐ 610 Agriculture | ☐ 422 Appeal 28 USC 158 | ☐ 400 State Reapportionment |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 362 Personal Injury— Med. Malpractice | ☐ 620 Other Food & Drug | ☐ 423 Withdrawal 28 USC 157 | ☐ 410 Antitrust |
| ☐ 130 Miller Act | ☐ 315 Airplane Product Liability | ☐ 365 Personal Injury— Product Liability | ☐ 625 Drug Related Seizure of Property 21 USC 881 | | ☐ 430 Banks and Banking |
| ☐ 140 Negotiable Instrument | ☐ 320 Assault, Libel & Slander | ☐ 368 Asbestos Personal Injury Product Liability | ☐ 630 Liquor Laws | **PROPERTY RIGHTS** | ☐ 450 Commerce |
| ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 330 Federal Employers' Liability | | ☐ 640 R.R. & Truck | ☐ 820 Copyrights | ☐ 460 Deportation |
| ☐ 151 Medicare Act | ☐ 340 Marine | **PERSONAL PROPERTY** | ☐ 650 Airline Regs. | ☐ 830 Patent | ☐ 470 Racketeer Influenced and Corrupt Organizations |
| ☐ 152 Recovery of Defaulted Student Loans (Excl. Veterans) | ☐ 345 Marine Product Liability | ☐ 370 Other Fraud | ☐ 660 Occupational Safety/Health | ☐ 840 Trademark | ☐ 480 Consumer Credit |
| | ☐ 350 Motor Vehicle | ☐ 371 Truth in Lending | ☐ 690 Other | | ☐ 490 Cable/Sat TV |
| ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 355 Motor Vehicle Product Liability | ☐ 380 Other Personal Property Damage | **LABOR** | **SOCIAL SECURITY** | ☐ 810 Selective Service |
| ☐ 160 Stockholders' Suits | ☐ 360 Other Personal Injury | ☐ 385 Property Damage Product Liability | ☐ 710 Fair Labor Standards Act | ☐ 861 HIA (1395ff) | ☐ 850 Securities/Commodities/ Exchange |
| ☐ 190 Other Contract | | | ☐ 720 Labor/Mgmt. Relations | ☐ 862 Black Lung (923) | ☐ 875 Customer Challenge 12 USC 3410 |
| ☐ 195 Contract Product Liability | | | ☐ 730 Labor/Mgmt.Reporting & Disclosure Act | ☐ 863 DIWC/DIWW (405(g)) | ☐ 890 Other Statutory Actions |
| ☐ 196 Franchise | | | ☐ 740 Railway Labor Act | ☐ 864 SSID Title XVI | ☐ 891 Agricultural Acts |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | ☐ 790 Other Labor Litigation | ☐ 865 RSI (405(g)) | ☐ 892 Economic Stabilization Act |
| ☐ 210 Land Condemnation | ☐ 441 Voting | ☐ 510 Motions to Vacate Sentence | ☐ 791 Empl. Ret. Inc. Security Act | **FEDERAL TAX SUITS** | ☐ 893 Environmental Matters |
| ☐ 220 Foreclosure | ☐ 442 Employment | **Habeas Corpus:** | | ☐ 870 Taxes (U.S. Plaintiff or Defendant) | ☐ 894 Energy Allocation Act |
| ☐ 230 Rent Lease & Ejectment | ☐ 443 Housing/ Accommodations | ☐ 530 General | | ☐ 871 IRS—Third Party 26 USC 7609 | ☐ 895 Freedom of Information Act |
| ☐ 240 Torts to Land | ☐ 444 Welfare | ☐ 535 Death Penalty | | | ☐ 900 Appeal of Fee Determination Under Equal Access to Justice |
| ☐ 245 Tort Product Liability | ☐ 445 Amer. w/Disabilities - Employment | ☐ 540 Mandamus & Other | **IMMIGRATION** | | ☐ 950 Constitutionality of State Statutes |
| ☐ 290 All Other Real Property | ☐ 446 Amer. w/Disabilities - Other | ☐ 550 Civil Rights | ☐ 462 Naturalization Application | | |
| | ☒ 440 Other Civil Rights | ☐ 555 Prison Condition | ☐ 463 Habeas Corpus – Alien Detainee | | |
| | | | ☐ 465 Other Immigration Actions | | |

**V. ORIGIN** (Place an "X" in One Box Only)

| | | | | Transferred from | | Appeal to District |
|---|---|---|---|---|---|---|
| ☒ 1 Original Proceeding | ☐ 2 Removed from State Court | ☐ 3 Remanded from Appellate Court | ☐ 4 Reinstated or Reopened | ☐ 5 another district (specify) | ☐ 6 Multidistrict Litigation | ☐ 7 Judge from Magistrate Judgment |

American LegalNet, Inc.
www.FormsWorkflow.com

| | Cite the U.S. Civil Statute under which you are filing (Do not cite jurisdictional statutes unless diversity): |
|---|---|
| **VI.  CAUSE OF ACTION** | 42 U.S.C. Section 1983, 1985, 1986 |
| | Brief description of cause: |
| | Violation of Constitutional and Civil Rights |

| **VII.  REQUESTED IN** | ☐  CHECK IF THIS IS A **CLASS ACTION** | **DEMAND $20,000,000.00** | CHECK YES only if demanded in complaint: |
|---|---|---|---|
| **COMPLAINT:** | UNDER F.R.C.P. 23 | | **JURY DEMAND:** ☒ Yes ☐ No |

| **VIII.  RELATED CASE(S)** | (See instructions): | | |
|---|---|---|---|
| **IF ANY** | | JUDGE _____ | DOCKET NUMBER _____ |

DATE
September 24, 2009

SIGNATURE OF ATTORNEY OF RECORD
*Stephen A. Hart*

FOR OFFICE USE ONLY
RECEIPT #  _5613_        AMOUNT  $350.00  APPLYING IFP _____        JUDGE _____        MAG. JUDGE _____

*MS    9/24/09*

American LegalNet, Inc.
www.FormsWorkflow.com

```
Court Name: USDC California Southern
Division: 3
Receipt Number: CAS005613
Cashier ID: msweaney
Transaction Date: 09/24/2009
Payer Name: ROPERS, MAJESKI, KOHN LLP
----------------------------------
CIVIL FILING FEE
 For: CYNTHIA SOMMRE V USA
 Case/Party: D-CAS-3-09-CV-002093-001
 Amount:        $350.00
----------------------------------
CHECK
 Check/Money Order Num: 108205
 Amt Tendered:  $350.00
----------------------------------
Total Due:      $350.00
Total Tendered: $350.00
Change Amt:     $0.00


 There will be a fee of $45.00
 charged for any returned check.
```